**PROJECT HOPE, Plaintiff,**

v.

**M/V IBN SINA, her engines, boilers, etc., and United ARAB Agencies, Inc., United ARAB Shipping Co. (S.A.G.), Blue Ocean Lines and Neptune Orient Lines, Ltd., Defendants.**

**Blue Ocean Lines, Third–Party Plaintiff,**

v.

**Mill Transportation Company, Third–Party Defendant.**

**No. 97 Civ. 3853 (WHP).**

United States District Court, S.D. New York.

March 21, 2000.

David Y. Loh, Marcigliano & Campise, New York City, for Plaintiff.

M. Daniel Bach, Port Washington, NY, for Defendant Blue Ocean.

Robert A. Milana, London Fischer, LLP, New York City, for Defendant United Arab.

Patrick J. Corbett, Bigham Englar Jones & Houston, New York City, for Defendant Mill.

## MEMORANDUM & ORDER

PAULEY, District Judge.

This action involves a shipment of humulin, which is a form of insulin, that was declared a total loss after it was loaded and transported in a refrigerated container whose ambient temperature was mistakenly set too low. Having conducted a one-day bench trial, this Court now enters the following findings of fact and conclusions of law.

### Factual Background

A. The Shipment [1]

The shipper in this action, plaintiff Project Hope, is a private, non-profit organization that is in the business of making charitable donations of medicine and pharmaceutical supplies throughout the United States and overseas. In August 1996, Project Hope contacted a freight forwarder, Global Transportation Systems, Inc. ("Global"), to obtain a price quote for carriage of a refrigerated shipment of medical supplies from Winchester, Virginia to Cairo, Egypt. The medical supplies consisted of cartons containing vials of humulin, a type of insulin manufactured exclusively by Eli Lilly and Company ("Eli Lilly"), together with assorted laboratory and video equipment. To preserve the integrity of humulin, it must be maintained in a cool environment under refrigeration, but not frozen. The cartons containing Project Hope's humulin had printed warnings to that effect.

Global selected defendant Blue Ocean Lines ("Blue Ocean"), a non-vessel owning common carrier ("NVOCC"), to arrange for the intermodal carriage (by water and land) of the shipment. Blue Ocean, in turn, contracted with defendant United Arab Shipping Co., S.A.G. ("United Arab"),[2] an ocean common carrier of merchandise. United Arab's role was to provide a refrigerated ("reefer") container for the shipment and to transport that container on the ocean leg of the carriage.

Blue Ocean also contracted with third party defendant Mill Transportation, Inc. ("Mill"), a common carrier of merchandise by motor truck. As the land carrier, it was Mill's responsibility to transport the empty reefer container provided by United Arab to Project Hope's warehouse in Winchester, Virginia, known as the Hope Distribution Center ("HDC"). After the container was loaded and sealed by Project Hope at HDC, Mill would then transport the container to the Virginia International Terminal in Norfolk, Virginia (the "Norfolk terminal") to await loading aboard United Arab's vessel.[3]

On October 11, 1996, Project Hope received 957 cartons said to contain 95,474 vials of humulin from Eli Lilly. Project Hope then divided the cartons onto nine pallets, shrink-wrapped each load with plastic and secured them to the pallets with steel bands. The laboratory and video equipment were similarly fitted onto three additional pallets.

---

1. Except where otherwise indicated, the parties stipulated to the facts set forth in this section of the Court's memorandum and order pursuant to a joint statement of stipulated facts, dated March 19, 1999, and in the joint pretrial order, dated April 5, 1999.

2. At all relevant times, defendant United Arab Shipping Agencies, Inc. was the United States agent of Arab Shipping Co., S.A.G. (Joint Stmt. Stip. Facts, no. 9)

3. All claims and cross-claims against defendant Neptune Orient Lines have been discontinued. In addition, while Project Hope commenced an *in rem* action against defendant M/V IBN SINA, the vessel has not appeared, and Project Hope has not filed attachment or arrest proceedings against it.

On October 13, 1996, Blue Ocean confirmed with Global the following information: (1) one 20–foot reefer container was booked aboard M/V IBN SINA, Voyage 319 (the "vessel"); (2) the vessel was scheduled to sail from Norfolk on October 23, 1996 with an estimated arrival in Alexandria, Egypt on November 17, 1996; (3) Blue Ocean had instructed Mill to deliver the empty reefer container to HDC; and (4) the temperature of the container's reefer unit was to be set at 42° Fahrenheit.

On or about October 13, 1996, Blue Ocean prepared a dock receipt that was faxed to Mill, but not to United Arab. The dock receipt stated in relevant part:

TEMPERATURE MUST BE 42° F PLUS OR MINUS 5°

....DO NOT FREEZE....

VENTS MUST BE CLOSED

(Pl.'s Ex. 11) The dock receipt, and an accompanying telefax, were the only documents sent to Mill by Blue Ocean. The dock receipt contains no reference to the inland transportation of the shipment.

On October 15, 1996 at 4:06 p.m., Natalie Wood ("Wood") at United Arab's office in Norfolk Virginia, faxed a "UASC Work Order" ("Work Order") to Gibson Engineering, Inc., the reefer mechanics used by United Arab at the Norfolk terminal. (United Arab Ex. 13) The Work Order contained information concerning various reefer containers, including Project Hope's container. However, the requested temperature setting for Project Hope's container was not indicated on the Work Order when it was sent to Gibson Engineering.

Shortly after sending that fax transmission, Wood received a telephone call from Gibson inquiring as to the correct temperature setting for Project Hope's container. In response Wood immediately phoned United Arab's New Jersey office, since it had received the initial booking from Blue Ocean, and spoke with Nana Somuah ("Somuah"). Somuah, in turn, placed Wood on hold and phoned Blue Ocean to get the correct temperature setting. The

parties disagree as to what Blue Ocean represented was the correct temperature setting for the container. In any event, it is undisputed that after Blue Ocean responded to Somuah's inquiry, Somuah took Wood off hold and told her that the container temperature should be set to 24°. Wood, in turn, relayed this instruction to Gibson Engineering, whose personnel then recorded this figure on its copy of the Work Order. (United Arab Ex. 14)

On October 16, 1996, the temperature on the container's reefer unit was pre-set to 24° by Gibson Engineering. Later that day, Mill's driver, Gardner Coyle ("Coyle"), drove a tractor to the Norfolk terminal and coupled it to a chassis on which the reefer container had already been placed. See Joint Pretrial Order ¶¶ 42–43. Refrigeration units on such containers are self-contained; no special connections are needed between a reefer container and the tractor. See Tr/Morgan/71.

Coyle initially drove the empty container to the Mill container yard where he left it overnight. The next morning, he drove the container to HDC.

Once Coyle arrived at HDC with the empty container, Project Hope personnel loaded the pallets of humulin and equipment inside. Project Hope personnel did not check the temperature setting of the container, nor did they ask Coyle about it. Coyle remained in the truck's cab while the container was loaded. Chuck Clark, a distribution manager at HDC, was responsible for the loading of the container.

Although the reefer unit was pre-set for 24° by Gibson Engineering, there is testimony in the record that the unit was not actually turned on until some time later. Clark, Project Hope's distribution manager, testified in deposition that the reefer unit was activated after Coyle arrived in HDC's parking lot on October 17, 1996. However, the "partlow chart" (i.e., the temperature recording device) on the reefer unit indicated that the unit was started on October 16, 1996 during the afternoon,

which would suggest that Coyle turned the unit on at the Norfolk terminal when he picked up the empty container. The part-low chart further indicated that the temperature in the container was maintained between 26° and 28° from the afternoon of October 16, 1996 to October 24, 1996. Thus, the parties have stipulated that the reefer unit was operating continuously during this time period and maintained an interior temperature of 24°. *See* Joint Pretrial Order ¶ 68.

After the container was loaded and sealed, Project Hope gave Coyle an original, straight bill of lading which it had prepared. (Pl.'s Ex. 14) Coyle signed the document. The straight bill of lading only concerned the inland transportation of the container, and it made no reference to the correct temperature setting for the reefer unit. In the area of the bill of lading titled "Basic Description", the document read: "Medical Supplies." (Pl.'s Ex. 14)

Coyle drove away from HDC and delivered the container to the Norfolk terminal at 2:25 p.m. on October 17, 1996. While the container was in his physical custody, Coyle never checked its temperature setting. When he arrived at the Norfolk terminal, the terminal issued a Truck Interchange Receipt ("TIR") which noted that the container's temperature was –2(C) (between 26° and 28° Fahrenheit). (Mill Ex. 2) At that point, Coyle delivered certain paperwork to the terminal, including the straight bill of lading issued by Project Hope.

The Norfolk terminal is a "non-dock receipt" port, *i.e.*, it does not require a dock receipt to be submitted when a container is picked up or delivered. Nor is a dock receipt required for storage or shipment of cargo.

The documents which Coyle delivered to the terminal were forwarded to United Arab's agent, Norton Lilly, and received on October 18, 1996. United Arab received the dock receipt from the terminal, but the parties dispute whether Coyle had the dock receipt among the other paper-work he delivered, or whether the terminal received the dock receipt by some other means.

From October 18 to 24, 1996, United Arab's reefer engineers noted the container temperature read 24°. United Arab ultimately learned of the temperature discrepancy when one of its personnel was preparing the loading list for the vessel over the October 19–20 weekend. On October 22, 1996, United Arab advised Blue Ocean of the discrepancy; Project Hope learned of the problem on October 24, 1996. At that point, Project Hope advised Blue Ocean to remove the container from its loading schedule aboard the vessel. Thus, the container was never loaded onto the vessel.

B. *The Incorrect Temperature Setting For The Reefer Container Was Given By Defendant Blue Ocean*

A key dispute at trial centered on whether United Arab or Blue Ocean was responsible for providing Gibson Engineering with the wrong temperature setting for the reefer container. This question of fact is susceptible to only two resolutions: either Blue Ocean provided the incorrect figure of 24° to United Arab, which was then relayed back to Gibson Engineering; or Blue Ocean provided the correct figure to United Arab, and United Arab—specifically, Nana Somuah at the New Jersey office—misspoke when she repeated the temperature to her colleague in Norfolk, Virginia. Having had the opportunity to weigh the evidence and to assess the credibility of the relevant witnesses, this Court finds that Blue Ocean was the weak link in the communication chain.

As will be recalled, Wood, who worked in United Arab's Norfolk office, phoned Somuah, her colleague in United Arab's New Jersey, to ascertain the correct temperature setting for the reefer container. (Tr/Somuah/89) Somuah then placed Wood on hold, dialed Blue Ocean and asked to

speak with Julie Tkacz ("Tkacz"), her contact at Blue Ocean. Somuah testified that her call was transferred to a woman who told her that Tkacz was unable to come to the phone. (Tr/Somuah/90) After Somuah explained the reason for her call, and the woman (her identity was never determined) then called out to another person—whom Somuah assumed to be Tkacz—and asked for the temperature setting. Somuah overheard this request being called out through her end of the telephone. Somuah then heard someone she thought was Tkacz say aloud "24 degrees Fahrenheit." (Tr/Somuah/90) The woman speaking into the telephone at Blue Ocean repeated this figure. Somuah testified that she then disconnected her call with Blue Ocean, took Wood off hold, and relayed the 24° temperature setting.

Only a few seconds elapsed between the time Somuah heard the temperature given by Blue Ocean and when she repeated that number to Wood. (Tr/Somuah/91) Somuah testified that she heard the figure 24° conveyed to her twice, and she did not write down any figures or other information before relaying this number to Wood. (Tr/Somuah/95) On the witness stand, Somuah's recollection of the telephone call was clear. Tkacz, on the other hand, was far less convincing. Her recollection of the events was sketchy at best and, in several fundamental ways, demonstrably inaccurate.

For example, Tkacz testified that she initiated the telephone call to United Arab in order to provide the temperature setting, and that she placed that call between October 11 and 13, 1996. (Tr/Tkacz/134–35) However, based on telephone records produced by United Arab (United Arab Ex. 12), Blue Ocean was forced to concede that Tkacz was wrong. In fact, Blue Ocean stipulated to the sequence of telephone calls described above. (Joint Pretrial Order ¶¶ 29–33) Tkacz could not remember whether she spoke to Somuah; she could not even recall whether she spoke to a man or a woman.

(Tr/Tkacz/135) Indeed, Tkacz recalled virtually nothing about the telephone call she purportedly placed—except that she provided the correct temperature setting of 42° to someone.

Based on the sequence of events at issue, on the fact that the numbers "twenty-four" and "forty-two" do not sound alike when spoken, and most importantly on this Court's assessment of the relative credibility of Somuah's and Tkacz' testimony, the weight of evidence supports United Arab's contention that Blue Ocean provided the incorrect temperature setting for Project Hope's container.

## C. Project Hope's Actual And Incidental Damages

Surveyors for United Arab, together with surveyors for Project Hope's underwriter, Kemper Insurance Company ("Kemper"), jointly examined the shipment at the Norfolk terminal on October 29, 1996. (Joint Pretrial Order ¶ 69) A review of temperature recordings made by United Arab's reefer engineers had already confirmed that the cargo had been subjected to temperatures of 24° from October 17 to 24, 1996. (Joint Pretrial Order ¶ 67) Nevertheless, it was the opinion of both surveyors that the humulin had not frozen in light of its multiple layers of packaging material. (Dep/Crawley/32; United Arab Ex. 11) This finding precipitated a dispute between Kemper and Project Hope as to whether the humulin had actually been damaged. Kemper insisted on laboratory testing to establish proof of loss, while Project Hope maintained that no testing was necessary. (Dep/Crawley/39–40)

To support its position, Project Hope solicited opinions from Eli Lilly stating that the humulin should be deemed a total loss without any laboratory testing. (Pl.'s Exs. 17, 18, 19; Dep/Grosse/64–66) Project Hope proffered two reasons why merely exposing the humulin to below-freezing temperatures rendered it unfit for use. First, the low temperature could cause microscopic cracks in the vials creating a

risk of contamination in the humulin. In addition, low temperatures can alter the drug's molecular structure. (Pl.'s Ex. 19; Dep/Grosse/36)

On November 25, 1996, Kemper offered Project Hope $325,000 to settle its claim, which Project Hope rejected. (Dep/Crawley/48) Thereafter, on December 20, 1996, Kemper and Project Hope settled the claim for $357,000. (Dep/Crawley/57) In the context of the instant litigation, no party has disputed that placing the cargo in a sub-freezing environment, irrespective of the exact temperature inside the vials, rendered the humulin unfit for use and thus a total loss.

However, the parties sharply dispute Project Hope's recoverable damages. Project Hope did not purchase the first shipment of humulin it obtained in October 1996; rather, it was donated to them by Eli Lilly. (Dep/Beaulieu/10) Project Hope later used the proceeds of its settlement with Kemper to purchase a replacement shipment of humulin from Eli Lilly for $343,708 in January 1997. (Pl.'s Ex. 32)

Further complicating matters is the fact that no open market exists for humulin, and Eli Lilly's prices changed between October 1996, when the first shipment was received, and January 1997, when Project Hope ordered the replacement shipment. Moreover, no price list exists in the United States for the precise product that Project Hope obtained, U–40 insulin, because that variant is a non-standard concentration of insulin that is utilized in only a handful of countries. (Dep/Beaulieu/17) In order to extrapolate a value for U–40 insulin, Project Hope relies upon various prices for a more highly concentrated insulin product (U–100) and, multiplying by a factor of .40, calculates a per vial price between $6.01 and $6.30. Utilizing the lower figure, Project Hope argues that the fair value of the damaged humulin is $573,809.89. (Pl.'s Post Trial Mem. at 3–4) Project Hope also attempts to reconstruct a value for the damaged humulin by using a "gift in kind" inventory report prepared by Eli Lilly, together with a packing slip prepared by Project Hope at the time of shipping. (Pl.'s Ex. 16; Dep/Clark/174–75; Tr/30–34)

Defendants challenge Project Hope's reliance on pricing models for U–100 insulin and use of internal inventory records to measure its loss. Instead, defendants argue that damages are limited to replacement cost. With the insurance proceeds from Kemper, Project Hope secured a replacement shipment of 85,927 vials of humulin—somewhat less than the 95,474 vials contained in the original shipment—at a price of $343,708. Project Hope purchased less humulin for the replacement shipment because Eli Lilly's prices increased from $3.60 per vial to $4.00 per vial effective on or about January 1, 1997. Defendants argue that damages are nonetheless limited to replacement cost because Project Hope could have purchased the humulin in December 1996, before the price increase, and because an award of more than $343,708 would result in a windfall to Project Hope.

Project Hope also seeks to recover certain incidental expenses that were incurred in retrieving and disposing of the shipment. Specifically, Project Hope seeks $1,427.50 for independent laboratory testing of the damaged humulin (Pl.'s Ex. 18); $8,511.40 relating to refrigeration and storage of the cargo at the Norfolk terminal (Pl.'s Exs. 19, 20); $944.00 for transporting the damaged humulin back to HDC (Pl.'s Ex. 21); $763.86 for transporting the cargo for disposal (Pl.'s Exs. 22, 23); $2,331.00 for destroying the cargo (Pl.'s Exs. 24, 25); and $2,670.00 for surveying fees and expenses. These incidental expenses total $16,647.76.

## Discussion

### A. Project Hope's Prima Facie Case

Although the parties disagree as to whether the standard of liability to be applied in this case derives from the Carriage of Goods by Sea Act ("COGSA"), 46

App.U.S.C. § 1300, *et seq.*,[4] or from the Carmack Amendment to the Interstate Commerce Act, *see.* 49 U.S.C. § 14706 (formerly 49 U.S.C. § 11707) (1998),[5] the elements of a *prima facie* case of liability against a common carrier under either statute are substantially the same. *See Phoenix Assur. Co. of New York v. M/V Eagle Tide*, 1999 WL 163547, *10 (S.D.N.Y. Mar.24, 1999) (96 Civ. 8404(JGK)), *aff'd*, 199 F.3d 1323 (2d Cir. 1999). "The shipper must show shipment in good condition, arrival in damaged condition, and the amount of damages." *Id.* (internal quotation omitted) (citing *Conair Corp. v. Old Dominion Freight Line, Inc.*, 22 F.3d 529, 531 (3d Cir.1994); *Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.*, 616 F.2d 619, 625 (2d Cir.1980); *Sport World (U.K.) Ltd. v. M/V OOCL BREEZE*, 1996 WL 185675, at *5 (S.D.N.Y. Apr.18, 1996) (94 Civ. 2890(DC))).[6]

Once a *prima facie* showing has been made under the Carmack Amendment, the burden shifts to the carrier "to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." *Missouri Pacific R. Co. v. Elmore and Stahl*, 377 U.S. 134, 138, 84 S.Ct.

1142, 1144, 12 L.Ed.2d 194 (1964). The five defenses that a carrier may invoke include, *inter alia*, an act of the shipper. *See Missouri Pacific*, 377 U.S. at 137, 84 S.Ct. at 1143; *Windows, Inc. v. Jordan Panel Systems Corp.*, 177 F.3d 114, 117 (2d Cir.1999).

Under COGSA, in order to avoid liability a carrier must prove that the loss falls under one of the exceptions set forth in 46 U.S.C.App. § 1304. *See Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 105 (2d Cir.1977). Courts have held that under COGSA this burden is satisfied if a carrier can show that it is free from any fault or negligence. *See* 46 U.S.C.App. § 1304(2)(q); *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration*, 137 F.3d 94, 98 (2d Cir.1998); *Nissho–Iwai Co., Ltd. v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir.1983).

■ This Court finds that Project Hope established a *prima facie* case as against Mill and Blue Ocean. The original humulin shipment arrived at HDC in a refrigerated truck. (Dep/Clark/46) Upon arrival, Project Hope personnel inspected the cargo for physical damage and checked the temperature setting on the truck against

---

**4.** Although on its face COGSA applies only to "the period from the time when the goods are loaded on to the time when they are discharged from the ship," 46 U.S.C.App. § 1301(e), the terms of COGSA may be incorporated by contract to govern the parties' relationship before loading. *See Allied Chemical Int'l Corp. v. Companhia de Nàvegacao*, 775 F.2d 476, 483 (2d Cir.1985). In this regard, United Arab has argued that it is entitled to COGSA's $500 per package limitation of liability because the dock receipt issued by Blue Ocean purportedly incorporated the terms of United Arab's ocean bill of lading, and one of those terms is the package limitation. Blue Ocean has similarly argued that its dock receipt incorporated the terms of its bill of lading.

**5.** The Carmack Amendment may apply even though the cargo at issue here only moved intrastate. *See Greenwald v. Pan American World Airways, Inc.*, 547 F.Supp. 159, 161–62 (S.D.N.Y.1982) (citing *New York, New Haven and Hartford Railroad Co. v. Nothnagle*, 346

U.S. 128, 131, 73 S.Ct. 986, 988, 97 L.Ed. 1500 (1953)) (in determining whether a particular movement of freight is interstate, intrastate or foreign commerce, the intention existing at the time the movement begins governs and fixes the character of the shipment).

**6.** By order dated March 31, 1999, this Court ruled that admiralty jurisdiction exists with respect to Blue Ocean's third-party claims against Mill. Although the land transportation of the humulin that was contemplated by the parties make the carriage a "mixed" contract, *see generally Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 109 (2d Cir.1997), the shipment's short transport from Winchester, Virginia to the ocean terminal at Norfolk, Virginia was "incidental" to the contract. *See, e.g., Joe Boxer Corp. v. Fritz Transp. Intern.*, 33 F.Supp.2d 851, 856–57 (C.D.Cal. 1998); *cf. Transatlantic Marine*, 968 F.2d at 199 (observing that movement of cargo from coast to coast across the United States may not be considered incidental, citing cases).

information on the bill of lading. (Dep/Clark/48) Thereafter, the humulin was stored for approximately seven days in walk-in refrigerators at Project Hope's HDC warehouse. The internal temperatures on Project Hope's refrigerators are continuously monitored by chart recorders. (Dep/Clark/50–52) There is nothing in the record to suggest any abnormal temperature fluctuations in the units during the relevant time period. On the contrary, Project Hope appears to have taken all the necessary precautions to preserve the integrity of the cargo while it was in its possession, and although no one actually lab tested the humulin at the HDC warehouse, such measures are not necessary to make out a *prima facie* case. *See generally Siderius v. M.V. Amilla*, 880 F.2d 662, 664 (2d Cir.1989).[7]

Defendants do not dispute that the humulin was damaged and that Project Hope can establish its monetary damages, though defendants obviously take issue with the actual amount of the loss. Accordingly, Project Hope has also satisfied the second and third branches of its *prima facie* case, at least as against Mill and Blue Ocean.

■ Project Hope cannot, however, establish the first element of its *prima facie* case against United Arab. Project Hope's own witness, Dr. William Grosse III, testified that the humulin was rendered unusable after only a brief exposure to below-freezing temperatures. (Dep/Grosse/71–72) In fact, Grosse indicated that "[a]ny exposure for any time" to below freezing temperatures would make using the drug unsafe. (Dep/Grosse/72) As he explained, "Again, you know, we're back to this probability theory of the damage, and the effect of frozen insulin would be so bad that we don't take any ... liberties with regard to this." *Id.* Here, it took approximately one hour for Project Hope to load the container, and it took Mill's driver another four hours to drive from the HDC warehouse to the Norfolk terminal. (Dep/Coyle/139) The temperature inside the reefer container remained at 24° throughout this period of time. Under Project Hope's theory of the case, the humulin was ruined long before the reefer container ever reached United Arab.

■ Even if Project Hope could establish a *prima facie* case against United Arab, the Court finds that United Arab met its burden under COGSA of proving that the loss of the humulin was caused by something other than its own negligence.[8] As set forth above, Blue Ocean provided United Arab with the incorrect temperature setting for the reefer container. Thereafter, United Arab caused Gibson Engineering to pre-set the temperature of the container in accord with Blue Ocean's instructions. United Arab received no other information concerning the correct temperature setting until after the container had been loaded and transported back to the Norfolk terminal. At that point, the container would have been loaded onto the vessel had United Arab not discovered the temperature discrepancy based on its re-

---

7. Because Project Hope delivered the cargo to Mill under seal, *i.e.*, packaged in such a way that Mill could not inspect it, the bill of lading signed without exception by Mill's driver only establishes that the cargo appeared to be in good condition based upon an external inspection. *See Sport World*, 1996 WL 185675, at *2.

8. United Arab's liability is governed by COGSA because Blue Ocean's dock receipt (Blue Ocean Ex. 3) incorporates the terms and conditions of United Arab's bill of lading. *See Nathan Trotter & Co. v. Delta Steamship Lines, Inc.*, 1982 WL 1543 (E.D.Pa. Apr.16, 1982). In that case, cargo was delivered to an ocean terminal but not loaded aboard the vessel because a shortage was discovered. Interpreting language that appears verbatim in Blue Ocean's dock receipt, *see infra*, Part D, the *Trotter* court found that a dock receipt executed by the terminal's receiving clerk extended the terms of COGSA to the pre-loading period. Contrary to Project Hope's assertions, the fortuity that the Norfolk terminal is a non-dock receipt port does not materially alter this analysis.

view of the dock receipt and other documents. (Dep/Lewis/24, 35)

In sum, United Arab was not negligent. Among the defendants, fault for the incorrect temperature setting lies with Mill and Blue Ocean. Accordingly, plaintiff's claims against United Arab are dismissed.

### B. *Defendants' "Act of The Shipper" Defense*

Moving beyond Project Hope's *prima facie* case, Mill and Blue Ocean argue that Project Hope's failure to check the temperature setting on the reefer container when loading the shipment constitutes a superceding cause of the loss. *See generally Missouri Pacific*, 377 U.S. at 136, 84 S.Ct. at 1144. The Court rejects this argument.

■ When a shipper assumes the responsibility of loading, as Project Hope did here, the general rule is that the shipper becomes liable for latent defects which cannot be discerned by ordinary observation by the agents of the carrier; however, if the improper loading is apparent, then the carrier will be liable notwithstanding the negligence of the shipper. *See Franklin Stainless Corp. v. Marlo Transport Corp.*, 748 F.2d 865, 868 (4th Cir.1984); *American Foreign Ins. Ass'n v. Seatrain Lines of Puerto Rico, Inc.*, 689 F.2d 295, 299 (1st Cir.1982); *Alitalia v. Arrow Trucking Co.*, 977 F.Supp. 973, 984 (D.Ariz.1997). Here, the temperature discrepancy inside the reefer container cannot be characterized as latent since the parties agree that the container was equipped with a temperature gauge. (Joint Pretrial Order ¶¶ 54, 56, 61; Tr/Morgan/68–69)

■ Mill and Blue Ocean further contend that the existence of the temperature gauge, together with what they presume must have been a suspiciously cold temperature inside the reefer container, placed Project Hope on notice of a problem during loading that they negligently failed to investigate. These arguments lack merit.

To satisfy its burden under the Carmack Amendment, a carrier must do more than show that the actions of the shipper contributed to the loss. "The burden [is] upon the carrier to prove that the loss or damage arose solely from one or more of the excepted causes, and it is of no avail to it to show that the shipper was in any way negligent, if the loss or damage would not have occurred, except for the concurring fault of the carrier." *Lehigh Valley R. Co. v. State of Russia*, 21 F.2d 396, 405 (2d Cir.1927); *see also Mooney*, 616 F.2d at 625. A carrier has a non-delegable duty to provide a vehicle suitable for the intended transportation, regardless of whether the shipper should have known of an apparent defect. *See, e.g., Martin Imports v. Courier–Newsom Exp., Inc.*, 580 F.2d 240 (7th Cir.1978) (carrier held liable for loss of wine that froze during transit, despite shipper's superior knowledge of the cargo's characteristics); *Watson Bros. Transp. Co. v. Feinberg Kosher Sausage Co.*, 193 F.2d 283 (8th Cir.1951) (shipper's failure to request that perishable cargo be protected from heat did not relieve carrier from liability for damage caused to goods because of the lack of refrigeration). Having provided a reefer container which doomed the shipment from the start, Mill and Blue Ocean cannot blame Project Hope for failing to discover their own negligence.

In that regard, Project Hope cannot be seriously faulted for not checking the temperature setting itself. Although Mill's expert witness testified that checking the temperature setting on a reefer unit is usually an easy task that can be accomplished in a minute or less, *see* Tr/Morgan/68–69 ("Q: Is it fair to say, Mr. Morgan, that it is relatively easy to check the temperature setting on a refrigerated unit? A: Usually, yes."), the record is unclear as to exactly where the gauge was located on the particular container used for Project Hope's shipment. There is also testimony in the record suggesting that the task may not exactly be effortless,

especially for a shipper such as Project Hope who was inexperienced with ocean reefer containers. *See* Dep/Clark/58 ("So, is it fair to say there were no procedures at Project Hope to check temperatures of reefer containers? A: There is no procedure to climb up on the front of an ocean container and try to determine what the temperature is set at. That is correct."). Prior to the shipment in question, Project Hope had never loaded an ocean reefer container and its personnel were unfamiliar with their operation. (Dep/Clark/24–25)

Nor can Project Hope be blamed for failing to notice that the interior temperature of the reefer container felt suspiciously cold. Following-up on an inquiry from the Court during trial, United Arab submitted a certified statement from the National Climatic Data Center indicating that the ambient temperature on the date of loading in Winchester, Virginia ranged from a high of 78° to a low of 48°. Nevertheless, the record does not permit anything more than speculation as to what might have been discernable to Project Hope personnel as they moved the cargo from HDC's walk-in refrigerators into the reefer container. *Cf. Shapiro v. Pennsylvania R. Co.*, 83 F.2d 581, 584–85 (C.A.D.C.1936) (carrier not liable where shipper loaded cargo consisting of fresh vegetables into a "hot" railway car in early August).

C. *Mill's Driver's Duty To Check The Temperature Setting For The Reefer Container*

■ At trial, Mill attempted to establish that it had no legal duty to check the temperature setting for the reefer unit because the correct setting was not indicated on the bill of lading issued by Project Hope, or any other documents strictly relative to the motor truck transportation by Mill, but rather was specified only on the dock receipt which it received from Blue Ocean. The Court finds Mill's argument unpersuasive.

As a preliminary matter, nothing in the Carmack Amendment requires that temperature instructions be set forth in a bill of lading. In fact, the statute envisions that a bill of lading may not even be issued and specifically provides: "Failure to issue a receipt or bill of lading does not affect the liability of a carrier." 49 U.S.C.A. § 14706(a)(1). Yet under Mill's theory, a trucker's duty to check container temperatures would turn on the type of the documentation used to convey that information. Such a rule would undermine the plain meaning of the statute and spawn litigation. A carrier's duty to provide suitable transportation flows from its obligation to care for the cargo entrusted to its possession, and not from the form of the documentation which it receives.

Although Mill offered expert testimony at trial suggesting that a custom and practice exists in the trucking industry of only checking container temperatures when a bill of lading contains temperature instructions, *see* Tr/Morgan/59, such a practice, if it exists, would not absolve Mill of liability. "Custom and usage do not justify negligence." *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1156 (2d Cir.1978); *see also Texas & Pacific Railway Co. v. Behymer*, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903) ("What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not."). As Judge Learned Hand observed in *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.1932), "[c]ourts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." Mill's expert witness conceded on cross examination that a trucker could not simply ignore temperature instructions because they were not written on the bill of lading. (Tr/Morgan/81)

Ironically, the evidence at trial established that such an ostrich-like approach is precisely what Mill's driver, Coyle, had in

mind. Coyle testified that with respect to reefer containers, he "could care less what the temperature is." (Dep/Coyle/46) *See also* Dep/Coyle/37 ("That's really none of my concern. I have no idea what temperature are on those things. That's part of pre-tripping."); Dep/Coyle/60 ("I had nothing to do with the refrigerator unit. Period."); Dep/Coyle/119 ("I don't mess with them things. I hate them anyway."). Coyle allowed, however, that if the refrigeration unit stopped working for some reason, then "we would have to call our office and let them know right away that it's not running." (Dep/Coyle/37) *See also* Dep/Coyle/ 47 ("[I]t has an on and off switch. You hit the on switch and it runs. That's all I have to worry about.").

The Court further finds that Coyle had the dock receipt in his possession when he arrived at HDC's warehouse for loading and when he drove back with the container to the Norfolk terminal. While Coyle could not specifically recall receiving the dock receipt, he could not rule out the possibility that he did. (Dep/Coyle/44; 143–44) In fact, United Arab received the dock receipt in a bundle of documents delivered by Coyle when he drove into the Norfolk terminal with the loaded reefer container. Among those documents were the bill of lading, signed by Coyle, together with a truck interchange report that had been generated when Coyle entered the terminal. Based on the relevant testimony and sequence of events, the inescapable conclusion is that Coyle had the dock receipt with him when he drove into the terminal. (Dep/Lewis/12–14; Dep/Turner/22, 46) Thus, Coyle had all the information he needed to check the temperature setting on the reefer container. He also had a duty to do so. *See Mooney,* 616 F.2d at 624; *Fine Foliage of Florida, Inc. v. Bowman Transp., Inc.,* 901 F.2d 1034, 1039 (11th Cir.1990).

Equally important is the undisputed fact that Mill received accurate temperature instructions from Blue Ocean on October 13, 1996. This was four days before Coyle drove the reefer container to the HDC warehouse for loading. As set forth above, the manner in which the temperature instructions were conveyed to Mill is not determinative. The exact circumstances as to how Mill let that information slip through its fingers are also collateral. The critical point is that Mill received accurate temperature instructions and did not follow them, even though checking the container's temperature setting should have been a relatively routine task for its driver or other personnel. For this reason, Mill cannot avoid its obligations as a carrier under the Carmack Amendment.

The Court has considered Mill's remaining arguments concerning its liability and finds them to be without merit.

### D. *Blue Ocean's Assertion Of COGSA Package Limitation*

■ Blue Ocean argues that it may invoke COGSA's $500 per package limitation of liability based on a clause in its dock receipt, which provides: "Received the above described goo[d]s or packages subject to all terms of the undersigned's regular form of dock receipt and of bill of lading which shall constitute the contract under which the goods are received, copies of which are available from the carrier on request and may be inspected at any of its offices." (Blue Ocean Ex. 3) Blue Ocean never attempted to establish the terms of its own "regular form" bill of lading, but rather suggests that it may rely on United Arab's bill of lading since "COGSA would have applied if the cargo did reach the ocean bound vessel." (Blue Ocean Post Trial Mem. at 16) The Court rejects this argument.

Under federal regulations, an NVOCC such as Blue Ocean is an agent of the shipper (in this instance, Project Hope) in its relationship with an ocean common carrier. *See Royal Ins. Co. v. M .V. ACX RUBY,* 1998 WL 524899, at *1 (S.D.N.Y. Aug.21, 1998) (97 Civ. 3710(MBM)). The dock receipt itself confirms this was the parties' understanding: it lists Blue Ocean

as the "Shipper/Exporter" and contains United Arab's booking number for the ocean carriage. Since Blue Ocean was not an agent of United Arab but instead acted as Project Hope's agent, it cannot avail itself of any protection that might be afforded by United Arab's bill of lading. *See Gross Machinery Group v. M/V "Alligator Independence"*, 1992 WL 47557, at *3 (S.D.N.Y. Mar.4, 1992) (91 Civ. 0460(JSM)) (holding that an NVOCC cannot avail itself of protections afforded by ocean carrier's bill of lading but is instead bound by terms of its own bill).

### E. *Damages*

 Having determined that Mill and Blue Ocean failed to rebut Project Hope's *prima facie* case, the Court turns to the issue of damages. Notwithstanding Project Hope's elaborate effort to establish the "market value" of humulin in the absence of a market, the Court finds that the most appropriate measure of damages is the cost of replacing the lost cargo. *See Oak Hall Cap and Gown Co., Inc. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291, 296 (4th Cir.1990) (where plaintiff secured substitute goods and sustained no loss on the transaction with its customer, replacement cost was appropriate measure of damages); *see also Thyssen, Inc. v.. S/S Eurounity*, 21 F.3d 533, 540 (2d Cir.1994) ("[T]he market discount theory is not the exclusive measure of damages and need not be applied if 'circumstances suggest a more appropriate alternative.'") (quoting *Texport Oil Co. v. M/V Amolyntos*, 11 F.3d 361, 365 (2d Cir.1993)). Thus, Project Hope is entitled to recover $343,708 against Blue Ocean and Mill for the cost of securing the replacement shipment of humulin. A greater award of damages based on an artificial estimation of market value would only result in a windfall to Project Hope.

With respect to incidental damages, Project Hope is entitled to recover the following charges: $2,670.00 for surveying fees and expenses; $8,511.40 for storage of the reefer container at the Norfolk terminal; $944.00 for transporting the damaged humulin back to HDC; $763.86 for transporting the cargo for disposal; and $2,331.00 for destroying the cargo. Based on the record evidence, the Court finds these charges fair and reasonable. However, the Court declines to award Project Hope damages based on charges for laboratory testing of the humulin in the amount $1,427.50. These services were performed eleven days after Project Hope settled its claim with Kemper, which should have obviated the need for testing. At trial, Project Hope did not attempt to establish why these charges were necessarily incurred. Excluding this amount, Project Hope's award of incidental damages totals $15,220.26.

Project Hope also seeks pre-judgment interest running from October 17, 1996, the date when the humulin was loaded into the reefer container. (Pl.'s Pre–Trial Mem. at 6) It is well established that courts should grant "pre-judgment interest in admiralty [actions] ... in the absence of exceptional circumstances." *See, e.g., Jones v. Spentonbush–Red Star Co.*, 155 F.3d 587, 593 (2d Cir.1998); *Mentor Ins. Co. v. Brannkasse*, 996 F.2d 506, 520 (2d Cir.1993). In the Second Circuit, the rate of interest used in awarding pre-judgment interest is within the court's discretion. *See, e.g., Mentor Ins.*, 996 F.2d at 520; *Ingersoll Milling Mach. Co. v. M/V BODENA*, 829 F.2d 293, 311 (2d Cir.1987) ("The rule in this Circuit ... is that the rate of interest used in awarding prejudgment interest rests firmly within the sound discretion of the trial court."). However, the rate of interest awarded should be sufficient to make the plaintiff whole. *See, e.g., McCrann v. U.S. Lines, Inc.*, 803 F.2d 771, 774 (2d Cir.1986) (holding that "it is wholly proper to award the unadjusted market rate of interest, which includes an inflationary component, since that is the rate at which appellee could have invested the money"); *Independent Bulk Transp., Inc. v. Vessel "MORANIA ABACO"*, 676

F.2d 23, 26 (2d Cir.1982) ("plaintiff is entitled to the income which the monetary damages would have earned"); *Zim Israel Navigation Co. v. 3–D Imports, Inc.,* 29 F.Supp.2d 186, 193 (S.D.N.Y.1998) ("The allowance of [pre-judgment] interest is not punitive but instead is compensation for the use of money that the prevailing party is entitled to but which its adversary had use of prior to judgment").

While the interest rate is discretionary, most courts in this Circuit have found that the most appropriate rate is the average interest rate paid on United States Treasury bills over either a six or twelve-month period. *See, e.g., McCrann,* 803 F.2d at 774 (approving award of pre-judgment interest in admiralty case based on six-month Treasury bill rates); *ECDC Envtl., L.C. v. New York Marine & Gen. Ins. Co.,* 1999 WL 595450, at *11 (S.D.N.Y. Aug.6, 1999) (96 Civ. 6033(BSJ)) (applying interest rate paid on six-month Treasury bills); *Barwil ASCA v. M/V SAVA,* 44 F.Supp.2d 484, 489 (E.D.N.Y.1999); *Zim Israel Navigation,* 29 F.Supp.2d at 193–94 (same); *Weeks Marine, Inc. v. John P. Picone, Inc.,* 1998 WL 717615, at *9 (S.D.N.Y. Oct.14, 1998) (97 Civ. 9560(SAS)) (applying 12 month average Treasury bill rate); *J.C.B. Sales Ltd. v. M/V SEIJIN,* 921 F.Supp. 1168, 1174 (S.D.N.Y.1996) (applying rate of short-term, risk-free U.S. Treasury obligations), *aff'd,* 124 F.3d 132 (2d Cir.1997); *Turecamo Maritime, Inc. v. Weeks Dredge No. 516,* 872 F.Supp. 1215, 1235 (S.D.N.Y.1994) (same); *M. Prusman Ltd. v. M/V NATHANEL,* 684 F.Supp. 372, 374 (S.D.N.Y.1988) (applying interest rate paid on six-month Treasury bills); *cf. Independent Bulk Transport,* 676 F.2d at 27 (pre-judgment interest award should be based on "short-term risk-free obligations"). Accordingly, this Court orders that from October 17, 1996 until judgment, interest shall be calculated based on the average interest rate paid on six-month United States Treasury bills.

Since Project Hope's claims against Mill sound in admiralty, Project Hope may recover directly against Mill as a third party defendant. *See* Fed.R.Civ.P. 14(c). The liability of Blue Ocean and Mill is joint and several, since both are equally responsible for Project Hope's loss and the record does not permit a fair allocation of comparative fault. *See generally Mooney,* 616 F.2d at 625–26.[9]

### Conclusion

For all these reasons, plaintiff Project Hope shall have judgment against defendant Blue Ocean Lines and third party defendant Mill Transportation Company, jointly and severally, in the amount of $358,928.26, with prejudgment interest from October 17, 1996 until judgment calculated based on the average interest rate paid on six-month United States Treasury bills. Plaintiff's claims against United Arab are dismissed.

SO ORDERED:

---

9. The parties' respective motions for reconsideration of this Court's order denying summary judgment, dated March 31, 1999, are denied.