616 F.2d 619
 GORDON H. MOONEY, LTD., Plaintiff-Appellee,
v.
FARRELL LINES, INC., as successor by merger to American
Export Lines, Defendant-Appellant,
and
Maislin Transport of Delaware and Maislin Transport Ltd.,
Defendants-Appellees.
 No. 415, Docket 79-7536.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 13, 1979.
Decided Feb. 22, 1980.
 
 John J. Palmeri, New York City, for plaintiff-appellee Mooney.
 Chester D. Hooper, New York City (Haight, Gardner, Poor & Havens, New York City, Keith L. Flicker, M. E. DeOrchis, New York City, of counsel), for defendant-appellant Farrell Lines, Inc.
 Harvey P. Rosenberg, New York City, Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, New York City, for defendants-appellees Maislin Transport of Delaware and Maislin Transport Ltd.
 Before MULLIGAN, OAKES and GURFEIN,* Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This appeal, by the ocean carrier of a refrigerated ("reefer") container of frozen Dover sole, is from a judgment of the United States District Court for the Southern District of New York, Lloyd F. MacMahon, Judge. The judgment held the ocean carrier solely liable to the Canadian buyer-consignee for the value of the fish, which arrived in a decomposed state, even though it was the inland carrier that changed the reefer temperature setting from - 5o or - 10o Fahrenheit to 40o Fahrenheit. Following reference to and a report by Magistrate Jacobs, the district court held that the ocean carrier, American Export Lines, Inc. (Export), was solely negligent; that Export's negligence in presenting the inland carrier, Maislin Transport of Delaware and Maislin Transport Ltd. (collectively Maislin), with an inland bill of lading ("inland bill") that contained no temperature directions and an "equipment interchange receipt" or "Trailer Interchange Receipt" (TIR) that referred to a 50o "required" temperature setting, rendered Maislin not negligent; and that it was therefore unnecessary to determine Export's claim of a right to indemnity or contribution or Maislin's claim of a $500 limitation of liability. Judgment was awarded to the plaintiff shipper solely against Export's successor by merger, Farrell Lines, Inc., for 92,100 Canadian dollars plus interest. We reverse.
 
 FACTS
 
 2
 A brief review of the evidence and the documents is necessary. After receipt from Gordon H. Mooney, Ltd., the plaintiff below, of a purchase order for 1400 cartons of Dover sole, the Netherlands supplier packed the cartons into a pre-cooled refrigerated reefer without incident. When received at the Amsterdam dock, however, the refrigerated unit developed a malfunction and the 1400 cartons had to be transferred to another reefer by the carrier, Export. A second malfunction developed and another transfer was made, but there is no dispute in the case that following the second transfer the 1400 cartons were still in their original, frozen condition, and the trip from Holland to New York was without incident. When the container was delivered to Maislin for transportation from New York to Toronto on September 8, 1976, Export prepared an inland bill of lading which, while it referred to "Dover Sole," contained no instructions concerning temperature. In addition, Export's "Equipment Condition Inspection Report" said nothing in section 7 relating to "reefers," where there are three lines as to "req. temp. ____," "temp. set at _____," and "temp. reads _____." According to the testimony of the truck driver for Maislin, Mr. Terrell, he received these two documents and he also observed an Export reefer mechanic[1] get up on the container and read the temperature setting and then fill out a handwritten slip of paper or "chit," which he gave to Terrell. The reefer mechanic's chit, after noting the date and number of the trailer, says "req. temp. 50o , temp. set at 50o , temp. reads 50o ." Terrell then gave the chit to another Export employee who completed the equipment interchange receipt (TIR). There was no separate temperature reading when the TIR was filled out; rather, reference was made solely to the "chit." There is no dispute, however, that the temperature both was set at, and read, between - 5o and - 10o at the time of delivery to Maislin, though Maislin could not produce the "Partlow" thermograph chart that was on the reefer at the time of delivery.[2]
 
 
 3
 How or why the Export reefer mechanic made the error on the handwritten "chit" is only one of the several mysteries in the record. It is possible that the mechanic misread the thermograph, although that seems unlikely. The Maislin driver remembered the mechanic's climbing up to look at the chart. According to the surveyor who subsequently checked the matter out, there was some talk in the Export yard that there were several other containers containing photographic equipment or film in the yard on September 8 and that some of these carried with them a 50o required temperature. The mechanic may have assumed that the Dover sole reefer was one of those, but this explanation would mean that he did not look at the Partlow chart and conflicts with the Maislin driver's memory of the event. Or, conceivably, the mechanic may have acted intentionally, for reasons that can only be surmised.[3] The mystery is unsolved.
 
 
 4
 The fact remains, however, that it was the Maislin people who changed the temperature setting on the containers in question to 40o , probably after the reefer arrived at Fort Erie, Ontario. The Maislin witnesses testified that when their clerical office sought to fill out their "pro" or "way" bill at the terminal in South Kearny, New Jersey, Mrs. Crapser, the clerk with the responsibility for preparing the bill, decided that the container needed some "protective service," not, she said, because she knew what Dover sole was, but because she saw the word "reefer" and wondered if it was fish. She made inquiry of the Maislin line haul dispatcher, Mr. Gallo, and brought to his attention the fact that the container was a reefer and that it should have "protective service." According to his testimony, although he had the TIR showing a 50o required setting, he called the maintenance man, Lefty Fahrenfeld. Lefty left the terminal to check the setting, presumably made a physical check, and came back in a matter of minutes and said that it was running at 40o . All this supposedly occurred on September 8, the day the shipment arrived at Maislin's yard in South Kearny, New Jersey. The 40o figure was inserted by Mrs. Crapser on the pro or way bill as the temperature to be maintained, and it was subsequently carried on the Maislin record of "Thermo-King" temperature checks as the required setting. There is also in evidence a memo dated September 9 on a Crystal Glass Company memo pad, evidently written at Fort Erie, Ontario by a Maislin employee, reading:
 
 
 5
 Came from Buffalo at 10o F,
 
 
 6
 Temp. does not go up.
 
 
 7
 Should be a 40o F.
 
 
 8
 Shut off.
 
 
 9
 leave it shut off.
 
 Bill
 
 10
 And the Maislin Thermo-King temperature-check records contain two notations for September 9, when the truck left Buffalo for Canada: "reset for (illegible)" and "just arrived, shut off."
 
 
 11
 The Thermo-King readings between September 11 and September 20, by which time the container was sitting in Maislin's Toronto terminal, were lost or not available, see note 3 supra, but by September 20, the temperature reading had crept up to 35o . Thereafter, it stayed at 40o until about September 24. The Maislin records show no temperature readings after the 25th until 8:00 a. m. on the morning of the 27th, at which time the reading was 0o , even though the same Maislin record sheet called for a setting of 40o .[4] The temperature check record of September 29 shows the setting at 0o and the temperature reading at 20o . That was the day Maislin sought to make delivery to the consignee, but it was refused.[5] The following day, delivery was again attempted, but it was again refused and the goods were returned to the Maislin terminal for survey and potential salvage. The fish was subsequently found to be largely decomposed and spoiled, although some of it was apparently salvaged at a very low price immaterial to the consideration of our case. There was expert testimony from a transportation consultant, Cecil W. Henkels, to the effect that a TIR generally goes to a trucking line's operating department, as opposed to the rate clerk, but that an upward temperature change would not be made without authorization from either the original shipper or the carrier from which the shipment was obtained.
 
 DISCUSSION
 
 12
 The magistrate's and district court's findings that Export was negligent, and therefore liable,[6] were clearly supported by the evidence. Even though Export submitted evidence of numerous other reefer inland bills it had prepared which went to Maislin and contained no temperature directions, there was testimony by the marine surveyor that it was "certainly an error" not to have included such directions on the inland bill. Export's consultant, Mr. Henkels, confirmed that ordinarily all shipping instructions are contained on the shipping order. Moreover, there was the handwritten chit erroneously prepared by the Export reefer mechanic for whatever reason which did contain a 50o reading as well as a 50o setting. The same figures appear on the TIR, a more formal document prepared and signed by Export, though also signed by Terrell, the Maislin trucker. These errors at least contributed to the unfortunate chain of events and render Export liable. Export's own manager of maintenance and repair testified that he felt "there was an error made on both parts," the reefer mechanic's and the truck driver's.
 
 
 13
 But Maislin too was at fault, in a variety of ways. Its driver, Terrell, signed the TIR, noting that the equipment was "received in good condition except as noted." The temperature setting at that time was, indisputably, - 5o and the temperature reading was at or about - 10o .[7] Yet the TIR, based on the mechanic's chit, showed the reading as well as the setting at 50o , indicating that Terrell did not double-check the reefer mechanic. Moreover, even though Mrs. Crapser in the Maislin terminal at South Kearny may not have been alert as to what "Dover Sole" is, she was at least aware enough to suspect that "fish" was involved and that, the container being a reefer, some "protective service" was required. When Gallo accordingly sent "Lefty" out to check the trailer at a time when, according to all the expert testimony, the cargo was still at a very low temperature and probably had not thawed at all (it obviously would not have thawed at all if the temperature setting had not yet been changed), Lefty came back to report that the reefer was running at 40o . This was the figure adopted for use in the inland bill Mrs. Crapser prepared, an erroneous figure under any factual construction. An inquiry as to what "Dover Sole" is at this point, or a check with either Export, the original shipper, or even the consignee, would have revealed that the fish was or might be frozen, not smoked, and hence would require a 0o setting or lower. Instead, Lefty's 40o figure the source of which remains undetermined[8] was adopted without further check.
 
 
 14
 Despite the figure inserted on the TIR or the setting on the Maislin Thermo-King charts, the reefer apparently continued to retain its - 10o temperature. At least this is what the Thermo-King charts show, though a Maislin witness, its claims director, surmised that this was an error by the truck driver(s) and that he (they) had read the compression indicator rather than the temperature chart. In any event, on arrival September 9 at Fort Erie, Ontario, in the Maislin holding area, the reefer was "shut off" in according with "Bill's" directions on the Crystal Glass memo paper, in order to get it up to the 40o temperature called for, since "Temp. does not go up." The fact that it had to be "shut off" the record does not disclose for how long because the Maislin records are missing to get it up to a temperature of 40o is an indication that it was probably still set at a much lower temperature, or at least running at one. This shutting off would not have occurred had Maislin itself used proper procedures. True, as the magistrate suggested, it was partly due to the error in the TIR and hence to some extent "attributable to" Export. But it was negligent to change the temperature setting of the reefer without further inquiry. It was also negligent to prepare the way bill with a 40o setting requirement, without further inquiry or investigation, once it was learned that the cargo was fish being transported in a refrigerated container.
 
 
 15
 Even assuming that there was total reliance by the trucker on the TIR for temperature requirements here (which seems dubious because the 40o appearing on Maislin's way bill differs from the 50o figure on the TIR), we think that such reliance was unjustified. When a trailer is transferred from one carrier to another, employees of each do, or should, inspect it, and the receiving trucker's signature on the TIR is as much of a certification by him as to its condition as is the signature of the transferring carrier's employee. Cf. Anello v. Murphy Motor Freight Lines, Inc., 525 F.2d 276, 278 n. 2 (2d Cir. 1975) (as to condition of trailer itself). Moreover, the actual setting of the container temperature control is, if it differs substantially from the TIR figures, notice to the receiving carrier notice that at least should provoke further inquiry.
 
 
 16
 A finding of negligence or lack of it, unlike a finding of the underlying facts, is subject to review not based on the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). Master Shipping Agency, Inc. v. M. S. Farida, 571 F.2d 131, 133 (2d Cir. 1978); Director General of India Supply Mission v. S. S. Maru, 459 F.2d 1370, 1373 n. 3 (2d Cir. 1972), cert. denied, 409 U.S. 1115, 93 S.Ct. 898, 34 L.Ed.2d 699 (1973). On these facts, we have little difficulty in concluding that Maislin was negligent.
 
 
 17
 As a result, Maislin must be held liable along with Export. Under the Carmack Amendment,[9] which governs interstate motor carriers, a prima facie case for liability is made by proof of shipment in good condition, arrival in damaged condition, and the amount of damages. Missouri Pacific Railroad v. Elmore & Stahl, 377 U.S. 134, 138, 84 S.Ct. 1142, 1145, 12 L.Ed.2d 194 (1964). "Thereupon, the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." Id. (emphasis added).[10]
 
 
 18
 Because of its negligence, Maislin failed to rebut the prima facie case against it. See Continental Can Company v. Eazor Express, Inc., 354 F.2d 222 (2d Cir. 1965). It is true that certain actions of the shipper itself are one of the "excepted" causes that, if shown, can protect a carrier from liability for damage to goods. And the "shipper" for these purposes (Export, which delivered the goods to Maislin) certainly contributed to the events through its negligence. But a showing that Export as "shipper" is liable does not relieve Maislin as carrier of liability for the damage, if that damage would not have occurred except for Maislin's concurrent fault. Lehigh Valley R. Co. v. State of Russia, 21 F.2d 396, 405 (2d Cir.), cert. denied, 275 U.S. 571, 48 S.Ct. 159, 72 L.Ed. 432 (1927). That is to say, the excepted cause (here negligence of the ocean carrier qua "shipper") must be the sole cause. Id.; cf. Levatino Co. v. American President Lines, 337 F.2d 729, 730 (2d Cir. 1964) (admiralty case under Harter Act) ("act of God" was not sole cause of loss).
 
 
 19
 At the same time, because Export's negligence contributed to the loss, Export cannot obtain indemnity from Maislin. Cf. Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 567, 78 S.Ct. 438, 441, 2 L.Ed.2d 491 (1958) (shipowner "entitled to indemnity absent conduct on its part sufficient to preclude recovery"). With respect to the issue of possible contribution between these two tortfeasors, we note that maritime law, applicable to the conduct of Export, does permit contribution. Cooper Stevedoring Co. v. Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974). On the other hand, the liability of Maislin is predicated on the Carmack Amendment, and that legislation, as well as case law under it, is silent on the issue of contribution. See 49 U.S.C. § 20(11), (12) (1976), revised without substantive change and reenacted as 49 U.S.C.A. § 11707 (West Supp.1979). Nevertheless, because that amendment was merely an enactment of already existing common law rights, to which certain specific remedial rights were added, J & H Flyer Inc. v. Pennsylvania Railroad Co., 316 F.2d 203 (2d Cir. 1963), we feel justified in turning to common law principles to fill in the gap in the statute concerning contribution. Because there is a clear trend in the law toward a rule allowing contribution among joint tortfeasors, we hold that contribution is available here in this situation of joint liability shared by a maritime shipper and an inland trucker.
 
 
 20
 To the extent that Maislin may be said to have breached a warranty of workmanlike service, see Fairmont Shipping Corp. v. Chevron International Oil Co., 511 F.2d 1252 (2d Cir.), cert. denied, 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975), Export's own acts contributed to the breach, so that the parties are joint tortfeasors, see Hurdich v. Eastmount Shipping Corp., 503 F.2d 397 (2d Cir. 1974), as noted above.
 
 
 21
 Maislin argues, in a brief which otherwise simply relied on the magistrate's and district judge's findings, that Export, acting as agent for a shipper, voluntarily chose a lower release value rate carrying a $500 limitation of liability under the applicable tariff. The magistrate also thought that, due to the course of dealing between the two, Maislin's liability might be so limited, even though the Carmack Amendment requires that any such limitation of liability be "declared in writing by the shipper or agreed upon in writing as the released value of the property." 49 U.S.C. § 20(11) (1976).[11] The course of dealing referred to by the magistrate consisted of some 46 bills of lading prepared by Export on its forms and paying the minimum rate. But because neither the freight rate nor the valuation itself was written on the bill of lading, Maislin may not limit its liability under the statute. Mass v. Braswell Motor Freight Lines, 577 F.2d 665, 667 (9th Cir. 1978); Thomas Electronics, Inc. v. H. W. Taynton Co., 277 F.Supp. 639 (M.D.Pa.1967); Loeb v. Friedman's Express, Inc., 187 Misc. 89, 65 N.Y.S.2d 450 (Sup.Ct.App.Term), aff'd mem., 271 A.D. 873, 66 N.Y.S.2d 634 (1946), aff'd per curiam, 296 N.Y. 1029, 73 N.E.2d 906, cert. denied, 331 U.S. 851, 67 S.Ct. 1743, 91 L.Ed. 1859 (1947).
 
 
 22
 Judgment reversed; cause remanded; costs of appellant to be equally divided between appellant and appellee Maislin.
 
 
 
 *
 Judge Gurfein participated in the oral argument in this case and voted before his death on December 16, 1979 to dispose of the case in the manner set forth in this opinion. He was unable to concur in the opinion itself since it was drafted after his death
 
 
 [1]
 There was testimony that the reefer mechanic was an employee not of Export itself but of an independent maintenance contractor engaged by Export. Export, however, does not deny its responsibility for his acts on this account
 
 
 [2]
 This assumes, of course, that such a chart on a disc was inserted. Export did have its chart up to the date of delivery. There was testimony that in the ordinary course of business, a new one would have been inserted by the reefer mechanic. It is interesting that on October 8, 1976, after the damage to the fish was discovered, the surveyor removed a Partlow chart from the reefer which was a 7-day rather than the 31-day recording type although the thermograph operates on a 31-day cycle. The 7-day chart had no notations as to temperature, date installed, container number, or the like. Thus, if a Partlow chart had been installed at the time of delivery to Maislin it had also been removed by Maislin
 It is also interesting that Maislin's own records kept on "Thermo-King" charts and representing drivers' notations of the reefer temperatures supposedly taken every two hours are missing for the period Sept. 10-20 and intermittently thereafter.
 
 
 [3]
 Crawford, the surveyor, testified that various maintenance people at the pier informed him of what he called this "photographic material scenario," but when he asked if the people involved would talk to the Export lawyer he "was informed that if (he) mentioned anything of this nature again, that they would take physical action against (him)."
 
 
 [4]
 There was evidence that a Maislin employee in New York, apparently advised that the temperature setting was wrong, told the Toronto office on September 28: "Show 5 degrees. This is fish and where blood is coming from I don't know. Suggest you get this down before effecting delivery . . . ."
 
 
 [5]
 A skeptic might surmise that at the last minute, carrying out the instructions from New York, see note 5 supra, the Maislin people turned down the temperature of the reefer to stem the flow of fish blood and make the fish appear properly frozen before delivery to the consignee. This would tend to support the veracity of a record made by Mr. Darlington, an Export customs agent, of a telephone conversation he had with a Maislin employee in New York on October 8. He was informed in that call that the Maislin employee in the New York office who had sent these instructions "was aware that the container was set at wrong temp. and it was Maislin's mistake."
 
 
 [6]
 The question of what law governs Export's conduct is a somewhat difficult one. The district court thought that the applicable provision was in the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1303(2) ("The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."). But COGSA further states that "(t)he term 'carriage of goods' covers the period from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. § 1301(e). Thus an issue arises here because Export's negligence took place on land, after discharge from the ship. If COGSA does not apply here, then the applicable provision is the earlier Harter Act, 46 U.S.C. §§ 190-196, which has the effect of preserving the common law duty of a carrier to exercise due care in all handling of cargo, even when there are contrary contractual provisions. The question of which act applies ultimately matters little, however, because, "except for unimportant differences in phraseology, the two Acts come down to much the same thing, as to liabilities which might be incurred before loading or after unloading." G. Gilmore & C. Black, The Law of Admiralty § 3-25, at 148 (2d ed. 1975). For the same reason, we find it unnecessary to discuss the validity of a provision in Export's bill of lading stating that COGSA governs "before the shipment is loaded on or after it is discharged." See id. (no provision in COGSA explicitly authorizes "contracting out of Harter and in COGSA" for period after unloading and before delivery)
 
 
 [7]
 The district court found:
 (I)t is not disputed that the temperature inside the container was subfreezing upon its arrival in New York; that Maislin turned up the temperature setting to 40o Fahrenheit after taking custody of the cargo from Export; and that the cargo was in decomposed condition when opened in Toronto. . . .
 
 
 [8]
 The Maislin claims man, Pace, said that Gallo, the dispatcher, "concluded in his own observations that it would be safe to hold it somewhat cooler than (the 50o required by the TIR), and he chose a temperature of 40 degrees." Gallo testified that, after talking to Lefty, he told Mrs. Crapser that "(t)he reefer is running at 40 degrees and I will set it at 40 degrees."
 
 
 [9]
 49 U.S.C. § 20(11), (12) (1976), revised without substantive change and reenacted as 49 U.S.C.A. § 11707 (West Supp.1979)
 
 
 [10]
 Under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(2), liability falls upon the last ocean carrier, unless it can prove that it was not negligent, or that the loss was within one of the COGSA "excepted causes," Madow Co. v. S.S. Liberty Exporter, 569 F.2d 1183, 1185 (2d Cir. 1978). However, under the Carmack Amendment, 49 U.S.C. § 20(11) (1976), reenacted without substantive change as 49 U.S.C.A. § 11707 (West Supp.1979), the burden on an inland carrier is clearly to show both that it was free from negligence and that the damage to the cargo resulted from one of the excepted causes. Martin Imports v. Courier-Newsom Express, Inc., 580 F.2d 240, 242 (7th Cir.), cert. denied, 439 U.S. 983, 99 S.Ct. 574, 58 L.Ed.2d 655 (1978). This rule was misstated by the court below
 
 
 [11]
 The 1978 revision of this portion of the Carmack Amendment, intended to make no substantive change, is in 49 U.S.C.A. § 10730 (West Supp.1979) (carrier may establish rates "under which the liability of the carrier . . . is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation") (emphasis added)