250 F.3d 67 (2nd Cir. 2001)
 PROJECT HOPE, PLAINTIFF-APPELLEE/CROSS-APPELLANT,
v.
M/V IBN SINA, HER ENGINES, BOILERS, ETC., AND NEPTUNE ORIENT LINES, LTD., DEFENDANTS,
UNITED ARAB AGENCIES, INC., AND UNITED ARAB SHIPPING COMPANY, DEFENDANTS-APPELLEES,
BLUE OCEAN LINES, DEFENDANT/THIRD-PARTY PLAINTIFF,
v.
MILL TRANSPORTATION COMPANY, THIRD-PARTY-DEFENDANT-APPELLANT/CROSS-APPELLEE.
 Docket Nos. 00-7498(L), 00-7532(XAP)
August Term 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: December 5, 2000
May 4, 2001
 
 Third-party-defendant-appellant/cross-appellee Mill Transportation Company appeals following a bench trial in the United States District Court for the Southern District of New York (William H. Pauley III, Judge) in which it and defendant-appellee/third-party plaintiff Blue Ocean Lines were held jointly and severally liable to plaintiff- appellee/cross-appellant Project Hope for spoiled cargo. Project Hope cross-appeals contending that the district court erred both in its calculation of damages and in its dismissal of the claims against defendants-appellees United Arab Agencies, Inc. and United Arab Shipping Company.
 Affirmed in part, vacated in part and remanded for recalculation of damages.[Copyrighted Material Omitted]
 Patrick J. Corbett, Esq., Bigham, Englar, Jones &Houston, New York, NY, for Third-Party-Defendant-Appellant/Cross-Appellee Mill Transportation Company.
 David Y. Loh, Esq., Nicoletti Hornig Campise & Sweeney, New York, NY, for Plaintiff-Appellee/Cross-Appellant Project Hope.
 Robert A. Milana, Esq., London Fischer LLP, New York, NY, for Defendants-Appellees United Arab Agencies, Inc. and United Arab Shipping Company.
 Before: Walker, Chief Judge, Cabranes and Straub, Circuit Judges.
 
 John M. Walker, Jr., Chief Judge
 
 1
 Third-party-defendant-appellant/cross-appellee Mill Transportation Company ("Mill") appeals from a verdict, following a bench trial, of the United States District Court for the Southern District of New York (William H. Pauley III, Judge) finding Mill and defendant- appellee/third-party plaintiff Blue Ocean Lines ("Blue Ocean") jointly and severally liable to plaintiff-appellee/cross-appellant Project Hope for 95,474 vials of spoiled humulin, a type of insulin. See Project Hope v. M/V IBN SINA, 96 F. Supp. 2d 285, 298 (S.D.N.Y. 2000).
 
 
 2
 Project Hope initially contracted with Blue Ocean for transport of the humulin from Winchester, Virginia to Cairo, Egypt via the port of Norfolk, Virginia. Blue Ocean, in turn, subcontracted with Mill for the overland portion of the transport in Virginia and with United Arab for the oceangoing leg of the transport. When Mill transported the humulin at the wrong temperature, it spoiled.
 
 
 3
 On appeal, Mill challenges on two grounds that part of the district court's judgment making the damage award joint and several. First, Mill argues that in imposing joint and several liability the district court improperly resorted to federal admiralty law, which permits joint and several awards in the normal course in cases involving multiple tortfeasors. Second, Mill argues that, in any event, Project Hope failed to assert direct claims against Mill and cannot look to it for recovery.
 
 
 4
 Project Hope cross-appeals, contending that the district court erred (1) in relying on the replacement cost for the spoiled humulin to measure damages, (2) in calculating the actual damage award, and (3) in dismissing its claims against defendant-appellee United Arab Shipping Co. and its United States agent, defendant-appellee United Arab Shipping Agencies, Inc. (collectively, "United Arab").
 
 
 5
 We hold that the district court did not err in allowing joint and several recovery against Mill or in holding Mill liable to Project Hope despite Project Hope's failure to assert claims against Mill directly. With respect to Project Hope's cross-appeal, we hold both that the district court did not err in relying on the humulin's replacement cost to measure Project Hope's damages and that the district court properly dismissed Project Hope's claims against United Arab. However, because we find that the district court improperly calculated Project Hope's actual loss, we vacate the damage award and remand the case to the district court for recalculation.
 
 
 6
 The judgment of the district court is thus affirmed in part, vacated in part and remanded for recalculation of damages.
 
 BACKGROUND
 
 7
 Familiarity with the detailed factual account in the district court's opinion is assumed. See Project Hope, 96 F. Supp. 2d at 287-91. We recite only those facts relevant to the disposition of this appeal. No challenge has been made to the district court's factual findings, which we take to be true.
 
 
 8
 On October 11, 1996, Eli Lilly and Company ("Eli Lilly") donated to Project Hope 95,474 vials of humulin--a chemically synthesized form of insulin manufactured exclusively by Eli Lilly and taken "by more than 4 million people with diabetes around the world every day," see http://www.lillydiabetes.com/products/humulin.cfm (last visited April 6, 2001). Humulin must be stored within five degrees of 42 F at all times; otherwise, it will spoil.
 
 
 9
 Project Hope is a private, non-profit organization that makes charitable donations of medicine and pharmacy supplies both in the United States and abroad. In early October 1996, Project Hope contracted with Blue Ocean--a non-vessel owning common carrier--for it to arrange the transport of the donated humulin from Project Hope's warehouse in Winchester, Virginia to Cairo, Egypt. Blue Ocean, in turn, contracted separately with United Arab for the ocean carriage and Mill for the overland motor carriage. The arrangements called for United Arab to provide a refrigerated container ("reefer") to be used throughout the transport from Winchester to Cairo; United Arab was also to transport the humulin on board its vessel from the Virginia International Terminal in Norfolk, Virginia ("the Norfolk Terminal") to Cairo. Mill's responsibilities included picking up the empty reefer from United Arab at Norfolk Terminal, transporting the reefer to Project Hope's Winchester warehouse, waiting there while Project Hope's staff loaded the humulin into the reefer, and transporting the humulin-filled reefer back to the Norfolk Terminal for loading aboard United Arab's vessel.
 
 
 10
 On October 13, 1996, Blue Ocean prepared and faxed to Mill a dock receipt that stated in relevant part: "Temperature must be 42 F plus or minus 5 F **** Do not freeze **** Vents must be closed." According to the facts stipulated by the parties and accepted by the district court, neither Blue Ocean nor Mill provided a copy of the dock receipt to United Arab. On October 15, 1996, a Blue Ocean employee negligently misinformed a member of United Arab's staff that the reefer's temperature should be set at 24 F--eight degrees below freezing--rather than the proper 42 F temperature. As a result, United Arab set the reefer's temperature at 24 F.
 
 
 11
 Later that same day a truck driver for Mill picked up United Arab's reefer at the Norfolk Terminal and, the next morning, transported it to Project Hope's Winchester warehouse. Project Hope's personnel loaded the humulin into the reefer, but neither Mill's driver nor anyone on Project Hope's staff verified that the reefer's temperature was set properly. After the humulin was loaded, Mill issued a straight bill of lading to Project Hope for the inland transportation between Winchester and Norfolk.
 
 
 12
 Mill's driver returned to the Norfolk Terminal with the humulin on October 17, 1996, whereupon terminal personnel inspected the reefer and then issued Mill's driver a receipt that documented the container's temperature at -2 C (between 26 F and 28 F). At some point during the weekend of October 20, 1996, as United Arab was preparing to load the reefer onto its vessel, an United Arab employee discovered the error. As a consequence, the reefer was not loaded onto United Arab's vessel, and United Arab informed Blue Ocean, which in turn informed Project Hope, of the situation. No one disputes that "placing the [humulin] in a sub-freezing environment" rendered it "unfit for use and thus a total loss." Project Hope, 96 F. Supp. 2d at 291.
 
 
 13
 On December 20, 1996, Project Hope's insurance underwriter, Kemper Insurance Co. ("Kemper"), paid Project Hope for the spoiled humulin and for other incidental damages. On or about January 17, 1997, Project Hope used the insurance proceeds to purchase a replacement shipment from Eli Lilly. However, due to a January 1, 1997 increase in the price of humulin from $3.60 to $4.00 per vial, Project Hope was only able to secure with the insurance proceeds a replacement shipment of 85,927 vials of humulin, as compared to the 95,474 donated vials that had spoiled.[1]
 
 
 14
 On May 27, 1997, Project Hope sued, inter alia, defendants Neptune Orient Lines, Ltd.,[2] United Arab, and Blue Ocean, alleging that they had breached their duties and obligations as common carriers. Thereafter, defendant Blue Ocean filed a third-party complaint against Mill. Mill answered both Blue Ocean's complaint and Project Hope's original complaint.
 
 
 15
 On March 21, 2000, following a bench trial, the district court found Mill and Blue Ocean jointly and severally liable in the amount of $358,928.26, of which $343,708 was Project Hope's recovery for the humulin. See id. at 297-98. The district court also found that United Arab was not responsible for the incorrect temperature setting and therefore dismissed the claims against United Arab. See id. at 294.
 
 
 16
 Mill's appeal and Project Hope's cross-appeal followed.
 
 DISCUSSION
 I. Mill's Appeal
 
 17
 The thrust of Mill's appeal is directed toward avoiding liability, joint and several or otherwise, for the loss Project Hope suffered. It asserts two arguments in this effort. Despite its less-than-pellucid briefing on the issue, we understand Mill's first argument to be that the district court erroneously resorted to federal admiralty law principles in deciding to impose joint and several liability on Mill. See Project Hope, 96 F. Supp. 2d at 292 n.6. Mill's second argument is that after it was impleaded by Blue Ocean under Federal Rule of Civil Procedure 14(a), Project Hope failed to amend its original complaint to assert direct claims against Mill, and, thus cannot look to Mill for recovery.
 
 A. Admiralty
 
 18
 As noted, Mill's argument seems to be that the district court, in imposing joint and several liability, erroneously resorted to the federal common law of admiralty, under which such awards are a standard remedy in cases involving multiple tortfeasors. See McDermott, Inc. v. AmClyde, 511 U.S. 202, 220-21 (1994) (noting that in admiralty "[j]oint and several liability applies when there has been a judgment against multiple defendants"); The Atlas, 93 U.S. 302, 317-19 (1876) (adopting joint and several liability rule in admiralty); Coats v. Penrod Drilling Corp., 61 F.3d 1113, 1124-30 (5th Cir. 1995) (en banc) (stating that "joint and several liability is the maritime rule" and noting that "[b]y 1876, the common-law rule of joint and several liability" was being adopted in admiralty); Pennsylvania R.R. v. The Beatrice, 275 F.2d 209, 212-13 (2d Cir. 1960); see also 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-5, at 167 (2d ed. 1994); Celeste Coco-Ewing, Coats v. Penrod Drilling Corporation: The Fifth Circuit Adheres to the Doctrine of Joint and Several Liability in the General Maritime Law, 70 Tul. L. Rev. 785, 788 (1995); Marie R. Yeates et al., Contribution and Indemnity in Maritime Litigation, 30 S. Tex. L. Rev. 215, 217 (1989); cf. Drake Towing Co. v. Meisner Marine Constr. Co., 765 F.2d 1060, 1068 (11th Cir. 1985).
 
 
 19
 Mill's premise is infirm, however. Our review of the district court's judgment against Mill--both the finding of liability and the imposition of joint and several recovery--reveals that it was not grounded in admiralty.[3] See Project Hope, 96 F. Supp. 2d at 291-98. Rather, Mill's liability and the joint and several award were determined exclusively under two federal statutory schemes: the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300 et seq., and the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706.[4] We therefore turn to consider whether the joint and several award against Mill was proper under these statutes. The prima facie cases for both COGSA and the Carmack Amendment are identical for all relevant purposes here.
 
 B. COGSA and the Carmack Amendment
 
 20
 COGSA is not a proper basis for Mill's joint and several liablity. By its express terms, COGSA only "covers the period from the time when the goods are loaded on to [the ship] to the time when they are discharged from the ship." 46 U.S.C. § 1301(e) (defining "carriage of goods"); see also id. § 1300 (COGSA covers "contract[s] for the carriage of goods by sea to or from ports of the United States, in foreign trade . . . ."). Mill's negligence in failing to ensure that the reefer was set at the proper temperature occurred exclusively on land, while the humulin was being transported from Project Hope's Winchester warehouse to the Norfolk Terminal. Therefore, Mill's negligence was plainly outside COGSA's reach.[5]
 
 
 21
 The Carmack Amendment, however, does govern Mill's negligence.[6] In pertinent part, the Carmack Amendment provides: [A] carrier and any other carrier that deliver[] the property and [are] providing transportation or service subject to jurisdiction under [49 U.S.C. § 13501 are] liable to the person entitled to recover under the . . . bill of lading. The liability imposed . . . is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States . . . . 49 U.S.C. § 14706(a)(1).
 
 
 22
 The Carmack Amendment's reach is determined by reference to 49 U.S.C. § 13501, the provision of the Interstate Commerce Act that now establishes the regulatory jurisdiction of the U.S. Surface Transportation Board (formerly the Interstate Commerce Commission) with respect to the "transportation by motor carrier" of passengers and property. In relevant part, § 13501 extends the reach of the Carmack Amendment to motor carrier transportation of property:
 
 
 23
 (1) between a place in
 
 
 24
 (A) a State and a place in another State; [or]
 
 
 25
 (E) the United States and a place in a foreign country to the extent the transportation is in the United States; . . . .
 
 
 26
 Where multiple carriers are responsible for different legs of a generally continuous shipment, whether either § 13501(1)(A) or (E) is satisfied to trigger application of the Carmack Amendment is determined by reference to the intended final destination of the shipment as that intent existed when the shipment commenced. See Swift Textiles, Inc. v. Watkins Motor Lines, Inc., 799 F.2d 697, 699 (11th Cir. 1986) ("The nature of a shipment is not determined by a mechanical inspection of the bill of lading nor by when and to whom title passes but rather by the essential character of the commerce, reflected by the intention formed prior to shipment, pursuant to which property is carried to a selected destination by a continuous or unified movement." (internal citations and quotation marks omitted)); cf. Southern Pac. Transp. Co. v. ICC, 565 F.2d 615, 617 (9th Cir. 1977) (discussing the reach of Interstate Commerce Commission's jurisdiction). This intent fixes the character of the shipment for all the legs of the transport within the United States. See New York, New Haven & Hartford R.R. v. Nothnagle, 346 U.S. 128, 131 (1953) (citing Sprout v. South Bend, 277 U.S. 163, 168 (1928)); Greenwald v. Pan Am. World Airways, Inc., 547 F. Supp. 159, 161-62 (S.D.N.Y. 1982).
 
 
 27
 Thus, if the final intended destination at the time the shipment begins is another state, the Carmack Amendment applies throughout the shipment, even as to a carrier that is only responsible for an intrastate leg of the shipment. See, e.g., Merchants Fast Motor Lines, Inc. v. ICC, 528 F.2d 1042, 1044 (5th Cir. 1976) (discussing challenge to ICC ruling and stating "[i]t is elemental that a carrier is engaged in interstate commerce when transporting goods either originating in transit from beyond Texas or ultimately bound for destinations beyond Texas, even though the route of the particular carrier is wholly within one state"); Martinez v. Phillips Petroleum Co., 283 F. Supp. 514, 530-31 (D. Idaho 1968); cf. Texas v. United States, 866 F.2d 1546, 1559-60 (5th Cir. 1989) ("Determining the existence of the requisite `fixed and persisting' intent to move goods in interstate commerce turns in significant part on the factual context of each case."); Burlington N. Inc. v. Weyerhaeuser Co., 719 F.2d 304, 310 (9th Cir. 1983) (noting "intent manifested . . . at the time of shipment" fixes interstate or intrastate character of shipment and finding intent was for intrastate shipment). Similarly, if the final intended destination at the time the shipment begins is a foreign nation, the Carmack Amendment applies throughout the entire portion of the shipment taking place within the United States, including intrastate legs of the shipment. See Swift Textiles, 799 F.2d at 698-700; cf. United States v. Erie R.R., 280 U.S. 98, 102 (1929) ("[The character of a shipment] is not affected by the fact that the transaction is initiated or completed under a local bill of lading which is wholly intrastate . . . ."); Texas & New Orleans R.R. v. Sabine Tram Co., 227 U.S. 111, 126 (1913); Long Beach Banana Dist., Inc. v. Atchison, Topeka & Santa Fe Ry., 407 F.2d 1173, 1180-81 (9th Cir. 1969).
 
 
 28
 Here, Project Hope's intention that the humulin travel in foreign commerce was fixed before Mill transported the humulin from Project Hope's Winchester warehouse to the Norfolk Terminal. As a result § 13501(1)(E) is satisfied, and the Carmack Amendment governs Mill's liability even though Mill's role in the humulin's shipment was restricted exclusively to Virginia.
 
 
 29
 Having concluded that the Carmack Amendment controls Mill's liability, we must consider whether the district court's imposition of the joint and several award was permissible under the Carmack Amendment. To answer this question, we look to the federal common law of damages, which informs the propriety of damage remedies under the Carmack Amendment.[7] See, e.g., Hector Martinez & Co. v. Southern Pac. Transp. Co., 606 F.2d 106, 108 (5th Cir. 1979) ("[The Carmack Amendment] incorporates common law principles for damages."); J & H Flyer Inc. v. Pennsylvania R.R., 316 F.2d 203, 205 (2d Cir. 1963); see also Camar Corp. v. Preston Trucking Co., 221 F.3d 271, 277 (1st Cir. 2000); F.J. McCarty Co. v. Southern Pac. Co., 428 F.2d 690, 693 (9th Cir. 1970).
 
 
 30
 Doing so, we find that the district court's imposition of joint and several liability in this case was consistent with the federal common law of damages and, therefore, permissible under the Carmack Amendment. The district court imposed joint and several liability only after concluding that--as between Blue Ocean and Mill--"the record d[id] not permit a fair allocation of comparative fault." Project Hope, 96 F. Supp. 2d at 298. Where a fair allocation of liability cannot be made among multiple tortfeasors, the federal common law permits imposition of joint and several liability. See, e.g., Restatement (Second) of Torts § 879 (1979) ("If the tortious conduct of each of two or more persons is a legal cause of harm that cannot be apportioned, each is subject to liability for the entire harm, irrespective of whether their conduct is concurring or consecutive."); W. Page Keeton, Prosser and Keeton on Torts § 52, at 347-48 (5th ed. 1984) ("Single Indivisible Result: Certain results, by their very nature, are obviously incapable of any reasonable or practical division and . . . [n]o ingenuity can suggest anything more than a purely arbitrary apportionment of such harm. Where two or more causes combine to produce [a single loss], each may be a substantial factor in bringing about the loss, and if so, each is charged with all of it."); cf. Gordon H. Mooney, Ltd. v. Farrell Lines, Inc., 616 F.2d 619, 625-26 (2d Cir. 1980) (holding that, under the Carmack Amendment, comparative fault is the appropriate method for assigning liability among joint tortfeasors where fault is assignable).
 
 
 31
 Because the district court found that liability could not be fairly apportioned--a factual conclusion that is not challenged by Mill in this appeal--and because the common law of damages allows resort to joint and several liability in such instances, we hold that the district court's joint and several award against Mill was proper under the Carmack Amendment.
 
 C. Rule 14(a)
 
 32
 Mill's second line of attack on the joint and several award centers on the fact that after Blue Ocean served its third-party complaint against Mill pursuant to Federal Rule of Civil Procedure 14(a), Project Hope did not amend its original complaint to directly assert a claim against Mill. Mill argues that, as a result, it cannot be held liable to Project Hope. We disagree.
 
 
 33
 Mill has waived this challenge because it failed--either out of error or strategy--to raise it properly before the district court. If Mill had voiced an objection to the district court before the bench trial, Project Hope easily could have amended its complaint to assert claims directly against Mill. See Fed. R. Civ. P. 15(a). Even if Mill had raised the objection in a post-trial motion--when it was absolutely clear that Mill was to be held directly accountable to Project Hope--the district court could have taken steps to ameliorate any injury to Mill by, among other options, permitting Mill to amend its complaint to conform to the evidence at trial. See Fed. R. Civ. P. 15(b).
 
 
 34
 In any event, we hold that a formal amendment of a plaintiff's complaint asserting causes of action against a party impleaded under Rule 14(a) is unnecessary if the third-party is effectively on notice that it will be held liable on the plaintiff's claims and the two proceed against one another in an adverse manner. See, e.g., Wasik v. Borg, 423 F.2d 44, 46 (2d Cir. 1970); Falls Indus., Inc. v. Consolidated Chem. Indus., Inc., 258 F.2d 277, 287 (5th Cir. 1958); cf. generally Fed. R. Civ. P. 1 ("[The rules] shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."). The record is clear that throughout the district court proceedings Mill and Project Hope conducted themselves as though Project Hope was proceeding directly against Mill. For example, on its own initiative, Mill answered Project Hope's complaint and, in doing so, expressly denied that it breached any duty of care or contractual obligation owed to Project Hope. Likewise, Mill filed a pre-trial motion seeking dismissal of Project Hope's claims, which Project Hope contested.
 
 
 35
 For all of the foregoing reasons, the award of joint and several liability against Mill stands.
 
 II. Project Hope's Cross-Appeal
 
 36
 In its cross-appeal, Project Hope makes three arguments. First, it challenges the district court's use of the replacement cost, rather than the fair market value, to measure the value of the destroyed humulin. Second, Project Hope argues that even if the replacement value is the correct measure of damages, the district court erred in calculating the humulin's actual replacement cost. Third, Project Hope argues that the district court erred in dismissing the claims against United Arab because, it contends, United Arab had a "non-delegable duty to provide a vehicle suitable for the intended transportation."
 
 
 37
 We consider each of these contentions in turn.
 
 A. Method of Measuring Damages
 
 38
 We review the district court's choice of a measure of damages for an abuse of discretion. Cf. Thyssen, Inc. v. S/S EUROUNITY, 21 F.3d 533, 540 (2d Cir. 1994) (analyzing damages under COGSA). Having done so, we conclude that the district court did not exceed its discretion in relying on the replacement cost to calculate Project Hope's damages for the spoiled humulin.
 
 
 39
 Contrary to Project Hope's argument on appeal, the fair market value is not the exclusive measure of damages under the Carmack Amendment. See id.; Oak Hill Cap & Gown Co. v. Old Dominion Freight Line, Inc., 899 F.2d 291, 296 (4th Cir. 1990). While it is true that damages under the Carmack Amendment should generally be based on the fair market value, see Contempo Metal Furniture Co. v. East Tex. Motor Freight Lines Inc., 661 F.2d 761, 764 (9th Cir. 1981), we have held that it need not be applied if "circumstances suggest a more appropriate alternative." Thyssen, 21 F.3d at 540 (internal citation omitted).
 
 
 40
 Here, no open market existed to provide a fair market value of humulin, thus warranting reliance on the replacement cost. While Project Hope attempted to "construct" various market values from, among other considerations, the value Eli Lilly established in its "`gift in kind' inventory report" when it donated the original shipment of humulin, see Project Hope, 96 F. Supp. 2d at 291, the district court acted within its discretion in rejecting these constructed values because it reasonably believed they provided less reliable measures of Project Hope's loss. See id. at 297 (reasoning that a "greater award of damages [above the actual replacement cost] based on an artificial estimation of market value would only result in a windfall to Project Hope").
 
 B. Calculation of Damages
 
 41
 Project Hope next argues that even if the replacement cost for the humulin is appropriate for measuring damages, the district court's actual calculation was too low. Project Hope bases this argument on the fact that the portion of the district court's damage award going to the replacement of the humulin--$343,708[8] --covers the replacement of only 85,297 vials of humulin, which is 9,547 vials fewer than was actually lost due to the negligence of Mill and Blue Ocean. Compare Project Hope, 96 F. Supp. 2d at 297 ("Thus, Project Hope is entitled to recover $343,708 against Blue Ocean and Mill for the cost of securing the replacement shipment of humulin."), with id. at 291 ("With the insurance proceeds from Kemper, Project Hope secured a replacement shipment of 85,927 vials of humulin--somewhat less than the 95,474 vials contained in the original shipment--at a price of $343,708.").
 
 
 42
 A plaintiff suing under the Carmack Amendment is entitled to the "actual loss or injury to the property caused by . . . the carrier." 49 U.S.C. § 14706; see, e.g., Cleveland v. Beltman N. Am. Co., 30 F.3d 373, 377 (2d Cir. 1994); Oak Hall Cap & Gown Co., 899 F.2d at 296; see also Fredette v. Allied Van Lines, Inc., 66 F.3d 369, 372 (1st Cir. 1995). The $343,708 that was intended to cover the replacement cost of the humulin plainly did not compensate Project Hope fully for its "actual loss" since Project Hope was unable to replace all of the spoiled vials.
 
 
 43
 Mill nonetheless argues that the deficiency Project Hope suffered was one of its own making and that, as a result, Mill should not be made to cover the deficiency. Specifically, Mill argues that if Project Hope had purchased replacement humulin on December 20, 1996, the day it received the insurance proceeds from its insurer, Kemper, the $343,708 would have fully replaced the humulin that spoiled. Mill contends that, instead, Project Hope delayed ordering the replacement humulin until January 17, 1997, by which time Eli Lilly had increased the price per vial from $3.60 to $4.00, which precluded the $343,708 from fully replacing the original shipment of humulin.
 
 
 44
 Under the Carmack Amendment, Mill has the burden to prove that the plaintiff did not exercise reasonable diligence in mitigating its damages. See Frosty Land Foods Int'l v. Refrigerated Transport, 613 F.2d 1344, 1349 (5th Cir. 1980). We believe that Mill has failed to carry that burden. Eli Lilly's price increase occurred on January 1, 1997. Therefore, to accept Mill's argument, we would have to conclude that Project Hope acted unreasonably in delaying its replacement of the humulin for eleven days--that is, from its receipt of the insurance proceeds on December 20, 1996 until Eli Lilly's January 1, 1997 price increase. This we cannot do; under the circumstances, Project Hope did not act unreasonably.
 
 C. Claims Against United Arab
 
 45
 Finally, Project Hope contends that the district court erred in dismissing the claims against United Arab because, according to Project Hope, United Arab owed it a "non-delegable duty to provide a [reefer] suitable for the intended transportation." We are unpersuaded by this argument.
 
 
 46
 Even if United Arab owed a non-delegable duty to Project Hope to provide a suitable reefer, the dismissal of the claims against United Arab would remain appropriate. The fact remains that neither United Arab nor anyone to whom it delegated its duty of care to ensure the reefer's suitability acted negligently to proximately cause the humulin's spoilation.[9] See Project Hope, 96 F. Supp. 2d at 293 ("[T]he Court finds that . . . the loss of the humulin was caused by something other than [United Arab's] own negligence."); id. at 294 ("In sum, United Arab was not negligent. Among the defendants, fault for the incorrect temperature setting lies with Mill and Blue Ocean.").
 
 CONCLUSION
 
 47
 For the foregoing reasons, we affirm the district court's imposition of joint and several liability against Mill, but in response to the cross- appeal we vacate the damage award and remand the case for recalculation of damages based on the January 17, 1997 replacement cost for the 95,474 vials of humulin that were lost.
 
 
 48
 We also affirm the district court's dismissal of the claims against United Arab.
 
 
 49
 Mill shall bear the costs of this appeal.
 
 
 
 NOTES:
 
 
 [1]
 If Project Hope had purchased the replacement shipment of humulin before the January 1, 1997 price increase from $3.60 per vial, the total replacement cost for the 95,474 vials of spoiled humulin would have been $343,706.40, and thus the district court's $343,708 award would have completely covered the cost of replacement. However, after the price increase to $4.00 per vial on January 1, 1997, the total replacement cost for the 95,474 vials of spoiled humulin increased to $381,896. See Project Hope, 96 F. Supp. 2d at 291, 297.
 
 
 [2]
 The claims against Neptune Orient Ocean Lines were not pursued in the district court and are not at issue on this appeal. See Project Hope, 96 F. Supp. 2d at 287 n.3.
 
 
 [3]
 We note that to the extent the district court's opinion can be read to imply that Mill's liability to Blue Ocean arises from admiralty common law, see Project Hope, 96 F. Supp. 2d at 292 n.6, it is mistaken. Admiralty jurisdiction reaches contracts that are exclusively maritime, as well as certain "mixed" contracts, which are contracts that involve both maritime and non-maritime obligations. See Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 555 (2d Cir. 2000). Because Blue Ocean's contract with Mill for motor carriage of the humulin from Westminster, VA to Norfolk, VA was exclusively nonmaritime, admiralty jurisdiction would not reach disputes arising under it.
 
 
 [4]
 Effective January 1, 1996, the Carmack Amendment was recodified at 49 U.S.C. § 14706 from 49 U.S.C. § 11707 (1995), by the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995), which reorganized the Interstate Commerce Act by eliminating some provisions and relocating the remaining provisions to other places in Title 49. This recodification worked no substantive change on the Carmack Amendment.
 
 
 [5]
 The parties could have "extend[ed] COGSA so that it applie[d] prior to loading . . . , see 46 U.S.C. § 1307, but the extent of any application beyond the scope of the statute is a matter of contract," Hartford Fire Ins. Co., 230 F.3d at 557 (footnote omitted). There is no indication that such a contractual extension was undertaken with respect to Mill's liability to Project Hope. Cf. Project Hope, 96 F. Supp. 2d at 292 n.4 (noting that defendants Blue Ocean and United Arab contend that COGSA had been contractually extended to govern their liability to Project Hope before loading).
 
 
 [6]
 Surprisingly, none of the parties referenced the Carmack Amendment in their briefs, and its applicability was only first addressed in response to an inquiry by the court during oral argument--despite the fact that the district court plainly relied on either COGSA or the Carmack Amendment to assess liability, see Project Hope, 96 F. Supp. 2d at 291-94. Thus, we think a brief excursion into the background of the Amendment is in order.
 The Carmack Amendment was enacted in 1906 as an amendment to the Interstate Commerce Act of 1887. See Ward v. Allied Van Lines, Inc., 231 F.3d 135, 138 (4th Cir. 2000) (citing Act of June 29, 1906, ch. 3591, 34 Stat. 584). In enacting it, Congress intended to provide interstate carriers with reasonable certainty and uniformity in assessing their risks and predicting their potential liability. See Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 381 (5th Cir. 1998); Shao v. Link Cargo (Taiwan) Ltd., 986 F.2d 700, 704 (4th Cir. 1993). The Carmack Amendment did this both by establishing a single uniform regime for recovery by shippers "directly from [the] interstate common carrier in whose care their [items] are damaged," Windows, Inc. v. Jordan Panel Sys. Corp., 177 F.3d 114, 117-18 (2d Cir. 1999), and by "preempt[ing] [the] shipper's state and common law claims against a carrier for loss or damage to goods during shipment," Ward, 231 F.3d at 138; see, e.g., Adams Express Co. v. Croninger, 226 U.S. 491, 505 (1913). See generally Jeanne Kaiser, Moving Violations: An Examination of the Broad Preemptive Effect of the Carmack Amendment, 20 W. New Eng. L. Rev. 289, 294-301 (1998).
 "To make a prima facie case under the Carmack Amendment, a plaintiff must show 1) delivery to the carrier in good condition; 2) arrival in damaged condition; and 3) the amount of damages caused by the loss." See, e.g., Camar Corp. v. Preston Trucking Co., 221 F.3d 271, 274 (1st Cir. 2000) (citing Missouri Pac. R.R. Co. v. Elmore & Stahl, 377 U.S. 134, 137-38 (1964)). Once the prima facie case is established, "[l]iability attaches unless the carrier can establish one of several affirmative defenses; for example, by showing that the damage was the fault of the shipper or caused by an Act of God." Windows, 177 F.3d at 118; see, e.g., Allied Tube & Conduit Corp. v. Southern Pac. Transp. Co., 211 F.3d 367, 369 n.2 (7th Cir. 2000) ("The excepted causes are: acts of God, the public enemy, the act of the shipper himself, public authority, or the inherent vice or nature of the goods." (citing Missouri Pac. R.R., 377 U.S. at 137)).
 
 
 [7]
 While the Carmack Amendment governs the liability of carriers to the original shipper of the goods (here, the liability of Blue Ocean and Mill to Project Hope), the situation is different regarding the liability of the two carriers inter sese (here, the liability of Mill and Blue Ocean to one another). "[O]rdinary rules of [the applicable state's] negligence [law] govern . . . action[s] to determine which of two carriers is liable [to the other]." American Foreign Ins. Ass'n v. Seatrain Lines of P.R., Inc., 689 F.2d 295, 299 (1st Cir. 1982).
 
 
 [8]
 Project Hope's total damage award was $358,928.26. The difference between this figure and the district court's $343,708 estimated replacement cost for the humulin represented Project Hope's recovery for various "incidental damages." Project Hope, 96 F. Supp. 2d at 297 ("Project Hope's award of incidental damages totals $15,220.26.").
 
 
 [9]
 The record indicates that Gibson Engineering, Inc., the "reefer mechanics used by United Arab at the Norfolk [T]erminal," actually set the reefer's temperature at the incorrect 24 F. Project Hope, 96 F. Supp. 2d at 288. However, no contention is made that Gibson acted negligently. As noted above, United Arab (or, more precisely, Gibson) acted upon the instructions negligently conveyed to United Arab by Blue Ocean.